UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHAEL GRESHAM,

                Plaintiff,                          Case No. 13-10189

                                                        HON. GERSHWIN A. DRAIN

vs.


DARRELL STEWARD, *et al.*,


                Defendant,


_____/

### ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDMENT [# 29], AND GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [#25], DENYING MOTION TO AMEND [#33] WITHOUT PREJUDICE AND DISMISSING DEFENDANTS HUDSON, JENKINS AND MCINNIS

On January 17, 2013, Michael Gresham, an inmate confined by the Michigan Department of Corrections, filed this civil rights action under 42 U.S.C. § 1983. From October 2012 to February 2013, while confined at the Macomb Correctional Facility ("MCF") in New Haven, Michigan, Plaintiff alleges that three prison officers, a prison nurse, and four administrative staff violated his First and Eighth Amendment rights.

Presently before the Court are the parties' cross-motions for summary judgment [# 25; # 29]. Defendants filed a response to Plaintiff's motion on March 27, 2014 [# 32]; Plaintiff filed a reply on April 11, 2014 [# 34] and an addendum on March 4, 2013 [# 31].

The parties' motions present four issues for review: (1) whether default judgment is appropriate for Defendants' alleged failure to file timely responsive pleadings; (2) whether any

1

party is entitled to summary judgment on Plaintiff's two First Amendment claims; (3) whether any party is entitled to summary judgment on Plaintiff's three Eighth Amendment claims; and (4) whether Defendants are shielded from civil liability by the doctrine of qualified immunity.

For the reasons that follow, the Defendants' motion is GRANTED IN PART, DENIED IN PART, and the Court requests further material to support Defendants' factual claims as to Plaintiff's transfer. Plaintiff's motion for summary judgment is DENIED.

## I. FACTUAL BACKGROUND

### A.  Plaintiff's Confinement History

Plaintiff, an inmate, was a member of the Residential Treatment Program ("RTP") at MCF. The Michigan Department of Corrections characterizes the RTP as "the recommended level of care for seriously mentally ill prisoners who continue to demonstrate significant impairments in social skills as well as a limited ability to participate independently in activities of daily living." (http://www.michigan.gov/corrections/0,4551,7-119-68854_68856_9744-23254--,00.html). Prisoners participating in the RTP are separated from the general population.

Plaintiff was a participant in the RTP at MCF until February 2013. A Security Classification Screen was completed by Defendant Sgambati on February 6, 2013. Defendants allege that through this routine evaluation, Plaintiff was revealed to have incurred 35 "management points." Consistent with Michigan prison policy directives, Defendants contend that Plaintiff's 35 "management points" animated Plaintiff's transfer order from a level-IV to a level-V security housing unit. Plaintiff was then discharged from RTP and transferred to a level-V prison in Marquette, Michigan.

### B.  Circumstances Surrounding Plaintiff's Physical Altercation with Prisoner Gunn

Beginning in October 2012 through February 2013, Plaintiff alleges that Defendants Adams, Hudson, and Jenkins, corrections officers at MCF, approached Plaintiff in his cell with the purpose of bringing about physical harm to the Plaintiff. Specifically, Plaintiff alleges that each Defendant referred to Plaintiff during these encounters as a "snitch." Further, Plaintiff attributes a deliberative quality to the officers' locution. He contends that each Defendant employed the culturally-loaded prison term "snitch" in front of other inmates with the purpose of inducing other prisoners to commit an assault on Plaintiff. Plaintiff also contends that, in January 2013, Defendants Adams solicited an assault on Plaintiff by offering other prisoners recreational paraphernalia (coffee, televisions). Defendants deny these allegations.

Plaintiff argues that Adams', Hudson's, and Jenkins' conduct was motivated by a sequence of grievances Plaintiff filed, which sought relief from his confinement conditions. Plaintiff contends Defendant Adams had an additional motive to retaliate against him. Specifically, that Plaintiff disclosed the alleged circumstances surrounding another prisoner's death in November 2012, which implicated Defendant Adams in professional misconduct. Defendant Adams denies the alleged misconduct. Defendants Adams, Hudson, and Jenkins deny having been motivated in any way by Plaintiff's protected actions.

On the morning of January 19, 2013, Defendant Jenkins witnessed Plaintiff and prisoner Lester Gunn engaged in a violent physical altercation. Defendants Adams, Hudson, and Jenkins responded to the outbreak. Defendants contend that after Plaintiff failed to comply with orders to stop fighting Defendant Jenkins deployed his Electronic Control Device ("ECD"), a Taser, which struck Plaintiff in his lower back and upper hip area. Plaintiff alleges the Taser also struck his face. Defendants Adams and Hudson assisted Defendant Jenkins in the physical restraint of prisoner Gunn and Plaintiff.

3

Plaintiff alleges his altercation with prisoner Gunn was intentionally induced by Defendants, who deliberately called Plaintiff a "snitch" in Gunn's presence, and that following the fisticuffs Defendant Adams remarked, "[t]hat's payback," in reference to grievances filed against fellow officers. Plaintiff also contends that Defendants removed coffee and a color television from his cell following the altercation and redistributed them to prisoner Gunn. Defendants maintain the coffee was contraband and was confiscated from Plaintiff's cell. They also deny distributing the coffee or television to prisoner Gunn as recompense for Gunn's altercation with Plaintiff.

Following the physical exchange between prisoners, Plaintiff was seen by a prison nurse, Defendant McInnis, who examined Plaintiff's medical condition. Plaintiff contends that, as a result of the Taser's contact with his face, he sustained a chipped tooth and bleeding lip. Defendant McInnis denies finding Plaintiff with any dental or oral afflictions. Plaintiff maintains that the medical care he received from Defendant McInnis was inadequate and that she deliberately refused proper care in order to conceal the amount of force used by Defendant Jenkins.

### C.  Circumstances Surrounding Plaintiff's Transfer to Level-V Security Prison

During his time in the RTP at MCF, Plaintiff filed grievances relating to his relationship with MCF staff, his conditions of confinement, and his status as an indigent. All of his complaints were rejected and then denied upon appeal. Plaintiff alleges that administrators at MCF transferred Plaintiff to a level-V security prison as a result of Plaintiff lodging voluminous complaints.

On February 6, 2013, Defendant Sgambati, Assistant Resident Unit Supervisor at MCF, completed a Security Classification Screen of Plaintiff. Defendants allege this routine procedure

revealed Plaintiff's accumulation of 35 "management points," which justifies Plaintiff's transfer to a level-V security facility pursuant to Michigan prison policy directives. An order for transfer was furnished. Defendant Grant, a Resident Unit Manager at MCF, is Defendant Sgambati's supervisor and oversees Defendant Sgambati's compliance with the policies and procedures of the Michigan Department of Corrections. Defendant Grant maintains Defendant Sgambati's conformity with prison transfer procedure. Both Defendant Grant and Sgambati deny Plaintiff's transfer was initiated by anything other than his "management points" and the consequent custody level (level-V) as defined by Michigan prison policy directives.

Plaintiff responds that his 35 "management points" pre-existed his transfer; in fact, Plaintiff contends that he had 35 points when he was initially sent to participate in the RTP at MCF. The "management points," Plaintiff argues, were inconsequential to his transfer; his transfer was instead retaliatory, motivated by the series of grievances he filed while at MCF.

Defendant Plummer, also a Resident Unit Manager at MCF, performs a final review of paperwork relating to prisoner transfers from MCF. Defendant Plummer signed Plaintiff's transfer order. Defendant maintains this was consistent with Michigan Department of Corrections policy directives and was not related to Plaintiff's grievances or other protected actions.

Plaintiff also maintains that he spoke with Defendants Grant, Plummer, Sgambati, and Steward[1] about officers referring to Plaintiff as a "snitch" in front of other inmates. Plaintiff contends that he conveyed a fear of physical retribution from fellow prisoners during these conversations. Defendants Grant and Steward acknowledge speaking with Plaintiff, but deny having understood Plaintiff's message to be implicating officers or other staff in the physical

---

[1] Defendant Steward is the Deputy Warden at MCF, supervising the department of custody and overseeing the safety of prisoners and prison staff.

endangerment of Plaintiff. Defendant Plummer denies having any personal knowledge of Plaintiff. After allegedly disclosing the actions of corrections officers that put his safety at risk, Plaintiff contends that Grant, Plummer, Sgambati and Steward "conspir[ed] together to transfer [Plaintiff] out of RTP and to a higher custody [level]" to "deter him [from] such protected conduct [i.e., making complaints about MCF officers]." (Pl. Mot. Summ. J. at 20-1).

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) empowers the Court to render summary judgment "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See Redding v. St. Eward*, 241 F.3d 530, 532 (6th Cir. 2001). The Supreme Court has affirmed the courts' use of summary judgment as an integral part of the fair and efficient administration of justice. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

The standard for determining whether summary judgment is appropriate is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Amway Distribs. Benefits Ass'n v. Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir. 2003) (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)). The evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Redding*, 241 F.3d at 532 (6th Cir. 2001). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine

issue of material fact." *Anderson*, 477 U.S. at 247–48 (emphasis in original); *see also Nat'l Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial." *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 270 (1968); *see also McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). Mere allegations or denials in the non-movant's pleadings will not meet this burden, nor will a mere scintilla of evidence supporting the non-moving party. *Anderson*, 477 U.S. at 248, 252. Rather, there must be evidence on which a jury could reasonably find for the non-movant. *McLean*, 224 F.3d at 800 (citing *Anderson*, 477 U.S. at 252).

## III. LAW AND ANALYSIS

### A.  Default Judgment

Plaintiff contends that default judgment should be granted because Defendants did not answer or defend within 20 days after being summoned. The Court has considered and rejected Plaintiff's argument once before. *See* Dkt. No. 27. Plaintiff's claim is DENIED.

### B.  Claims arising under the First Amendment

Title 42 U.S.C. § 1983 outlines the remedy for constitutional violations committed by state actors. In the instant case, Plaintiff alleges that government officials retaliated against him for exercising his First Amendment constitutional rights, actions that would form the basis of a constitutional violation. "It is well established that government actions, which standing alone do not violate the Constitution, may nonetheless be constitutional torts if motivated in substantial

part by a desire to punish an individual for exercise of a constitutional right." *Thaddeus-X v. Blatter*, 175 F.3d 378, 386 (6th Cir. 1999); *accord Crawford–El v. Britton,* 523 U.S. 574 (1998).

Plaintiff alleges two claims of retaliation that stem from the exercise of his First Amendment rights. First, that his transfer to another prison, executed by the Defendants Sgambati, Grant, Plummer, and Steward, was motivated by grievances Plaintiff filed against prison staff. His second claim alleges that his encounter with prisoner Gunn was "set up" by Defendants Adams, Hudson, and Jenkins, who were motivated by grievances Plaintiff filed.

The Sixth Circuit has outlined a three-part framework to establish a First Amendment retaliation claim.

> (1) The plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by the plaintiff's protected conduct.

*Thaddeus-X*, 175 F.3d at 394.

### 1.  Protected Conduct

The first step in Plaintiff's retaliation claims is to determine whether the grievances he filed against prison officials are properly considered 'protected conduct.' In *Pell v. Procunier,* 417 U.S. 817, 822, 94 (1974), the Supreme Court held that "a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." Sixth Circuit case law has made clear that, included in a prisoner's otherwise more limited bundle of First Amendment rights, is the constitutionally protected right to file grievances against prison staff. In *Herron v. Harrison*, the court held that the plaintiff had an "undisputed First Amendment right to file grievances against

prison officials on his own behalf."  203 F.3d 410, 415 (6th Cir. 2000); *see also Hill v. Lappin*, 630 F.3d 468 (6th Cir. 2010).

If the grievances are frivolous, however, this right is not protected. *Herron*, 203 F.3d at 415; *see also Lewis v. Casey*, 518 U.S. 343, 353 (1996) ("Depriving someone of a frivolous claim ... deprives him of nothing at all, except perhaps the punishment of Federal Rule of Civil Procedure 11 sanctions."). Despite the Michigan Department of Correction's grievance and grievance appeals processes, which rejected Plaintiff's complaints for failing to state issues concisely or otherwise according to procedure, this Court finds that Plaintiff's grievances are protected conduct. This Court cannot say that the grievances, although scattered, are *prima facie* frivolous. Plaintiff has met the first requirement of establishing protected conduct.

### 2.  Adverse Action

The Plaintiff must also establish that the Defendants took an adverse action against him. An adverse action "is one that would 'deter a person of ordinary firmness' from the exercise of the right at stake." *Thaddeus-X*, 175 F.3d at 396 (citing *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982)).  In the Sixth Circuit, a transfer is an action that can be adverse as a matter of law. *Thaddeus-X*, 175 F.3d at 396. Therefore, the Court finds that Plaintiff has met his burden to preclude summary judgment for Defendants Sgambati, Grant, Plummer, and Steward, who oversaw his transfer, on the issue of an adverse action.

The second retaliation claim, which arises out of Plaintiff's encounter with prisoner Gunn and alleges that Defendants Adams, Hudson, and Jenkins "set up" the confrontation, requires a more fine-grained application of the "ordinary firmness" standard. The Sixth Circuit has emphasized the context-specific nature of adverse action inquiries, stating that "[p]risoners may

be required to tolerate more than public employees, who may be required to tolerate more than average citizens, before an action taken against them is considered adverse." *Id* at 398.

"While certain threats or deprivations are so *de minimis* that they do not rise to the level of being constitutional violations," the adverse action threshold is only intended to "weed out inconsequential actions, and is not a means whereby solely egregious retaliatory acts are allowed to proceed past summary judgment." *Id*. The question before this Court is whether there is a genuine issue of material fact regarding the deterrent effect on Plaintiff's constitutional right to file grievances engendered by the alleged action ("setting up" the assault). The Court need not pause for long. The deterrent effect of physical harm as claimed by Plaintiff is sufficient, even in the context of prison, to establish an adverse action by Defendants.

### 3. Causal Connection

The third element of a First Amendment retaliation claim resides in the subjective motivation of the defendant. A plaintiff must establish a "causal connection between the protected conduct and the adverse action." *Thaddeus-X*, 175 F.3d at 399. Specifically, a plaintiff "must show that the [action] was motivated, at least in part, by the plaintiff's protected activity." *Smith v. Campbell*, 250 F.3d 1032, 1038 (6th Cir. 2001).

A robust body of case law governs the analysis of "motive" in retaliation claims. First, a plaintiff holds the burden of establishing that her protected conduct was a motivating factor behind any harm. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274 (1977). Once established, the burden of production shifts to the defendant, who is entitled to summary judgment if she can show that the same action would have been taken in the absence of the protected activity. *Thaddeus-X*, 175 F.3d at 399.

10

As to the claim of retaliatory transfer, Defendants contend that Plaintiff has failed to meet his initial burden. The Court finds that Plaintiff's affidavits and supporting materials establish his initial burden as to Defendants Sgambati, Grant, Plummer, and Steward to preclude summary judgment in favor of Defendants. It is not this Court's "function … to weigh the evidence and determine the truth of the matter but [rather] to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 251. Plaintiff's materials cite with specificity the dates and nature of conversations with these Defendants that support a motive for retaliatory transfer.[2]

The burden shifts to the Defendants to demonstrate that the transfer would have been executed even in the absence of Plaintiff's protected activity. Defendants contend that their collective affidavits establish that Plaintiff was transferred because he was no longer part of the RTP and that his 35 "management points" "screened him at a higher security level." (Def. Mot. Summ. J. at 17). Thus, Defendants contend that Plaintiff's transfer was effectuated by circumstances wholly independent of his engagement in protected actions. To support their claim that Plaintiff's 35 "management points" engendered his transfer, Defendants refer to a series of Michigan Department of Corrections Policy Directives. Defendants argue these directives guided their decision to transfer Plaintiff to a higher security level, not Plaintiff's grievances. The Court has reviewed the policy directives and found them to be, by themselves, insufficient grounds to warrant summary judgment in favor of the Defendants.

The policy directives outline the basic framework for determining an inmate's proper facility security level. The Department of Corrections P.D. 05.01.130 calls for a Security Classification Committee, which is "responsible for ensuring proper prisoner placement at the

---

[2] Specifically, Plaintiff identifies February 6, 2013 as the date Defendant Sgambati told Plaintiff he would "be transferred for filing too many complaints." (Pl. Mot. Summ. J. at 18). Also, that during a conversation in Defendant Grant's office, Grant "said she would transfer [Plaintiff] for his complaining."*Id*. Plaintiff raises similar allegations as to Plummer and Steward.

institution." P.D. 05.01.130. The committee is appointed by the prison warden and must "include at least two command staff supervisors…one of whom must be of the rank of Assistant Deputy Warden or above." *Id*. The committee may, at its discretion, "initiate a review of a prisoner's security level if the committee believes the level may have changed." *Id*. From the Defendants' collective affidavits, these procedures appear to have been followed.

Decisions made by the committee vis-à-vis a prisoner's placement must "be in accordance with PD 05.01.140 'Prisoner Placement and Transfer.'" *Id*. This section mandates that prisoner placement be consistent with another set of standards set forth in Administrative Rule 791.4401. *See* P.D. 05.01.140. Here, "a prisoner's security classification is a determination, based on the experience of correctional administrators, as to the level of confinement required for public safety and the safety of security of the facility." Admin. Rule 791.4401(1). A set of factors are put forth as the criteria upon which a classification determination can be made, including, *inter alia*, "[t]he safety of others; [t]he protection of the general public; [m]aintenance of control and order." *Id*.

Further, P.D. 05.01.135, Statistical Risk Screening, mandates that,

[A] Transfer Order shall be used … except if the transfer is to a different security level within the institution at which the prisoner is currently housed. Transfer Orders shall include the purpose of transfer…Security Threat Group (STG) designation, assaultive and property risk designations, current security screening designations, and any pertinent information as to special precautions which should be taken with that prisoner.

P.D. 05.01.135.

The policy directives as described do not, in any way, indicate a relationship between "management points" and "prisoner security levels." Instead, to determine a prisoner's security level, the directives explicitly outline basic criteria and procedure that factor into the determination, none of which were addressed by the Defendants. Nor have Defendants

established a factual basis upon which this Court can conclude that 35 "management points" effectuated Plaintiff's transfer. Given the lack of materials, the Court is unable to determine the significance of a 35 "management points" or how such a score would affect a prisoner's security level and the need to be transferred.

The facts presently before the Court preclude a determination that Plaintiff's "management points" effectuated his transfer and not his protected conduct. Defendants are not entitled to judgment in their favor on this claim. As to Plaintiff's motion for summary judgment on this claim, it is DENIED. The Defendants' contention that Plaintiff's "management points" animated his transfer creates a genuine dispute of material fact as to the issue of motive.

As to the second First Amendment retaliation claim, which arises out of Plaintiff's encounter with prisoner Gunn, the Court concludes that Defendants Hudson and Jenkins are entitled to summary judgment. These Defendants deny "setting up" an attack on Plaintiff, and deny that Plaintiff's grievances would motivate them to do so. Plaintiff's affidavits and other supporting materials fail to present anything more than the mere allegations found in his pleadings. Plaintiff has not come forward with "specific facts showing that there is a genuine issue for trial" on the issue of a causal connection. *First Nat'l Bank v. Cities Serv. Co.,* 391 U.S. 253, 270 (1968). Summary judgment is GRANTED in favor of Defendants Hudson and Jenkins on Plaintiff's second retaliation claim.

Plaintiff does, however, present sufficient evidence of a causal connection to preclude summary judgment in favor of Defendant Adams. Plaintiff's affidavit raises specific dates and motivations as to Defendant Adams' role in conducting a retaliatory assault on Plaintiff by Gunn. Specifically, Plaintiff alleges that on January 18, 2013, Defendant Adams called Plaintiff a "snitch" in front of prisoner Gunn while also offering to compensate Gunn for assaulting

Plaintiff. During this conversation, Plaintiff also alleges that Adams disclosed to Gunn that Plaintiff was a "snitch" because Plaintiff had filed legal actions against Adams' friends and co-workers. (Pl. Am. Compl. At 7). One day later, on January 19, 2013, Plaintiff alleges that prisoner Gunn stated "this is for Adams," and proceeded with the assault of Plaintiff that was soon broken up with a Taser. Defendant Adams denies that he induced Gunn to assault Plaintiff, or that he was motivated in any way by Plaintiff's protected conduct. The disputed nature of these facts puts the causal relationship between Plaintiff's protected actions and Adams' alleged conduct at issue and precludes summary judgment for either party.

### C.  Claims arising under the Eighth Amendment

It is well settled that although the Constitution does not "mandate comfortable prisons," *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981), "the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment[.]" *Helling v. Mckinney*, 509 U.S. 25, 31 (1993). By prohibiting "cruel and unusual punishments," the Eighth Amendment traces the outer limits of the constitutionality of prison officials' activities. *See Hudson v. McMillian*, 503 U.S. 1 (1992). In this way, the Amendment is a source of restriction on prison officials' conduct.

But the Amendment has a second important function. In addition to circumscribing constitutional conduct, the Amendment has been found to impose affirmative constitutional duties on officials, including the provisions of humane confinement conditions, adequate medical care, and the pursuit of "reasonable measure[s] to guarantee the safety of the inmates[.]" *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984); s*ee also Helling*, 509 U.S. at 31–32; *Washington v. Harper*, 494 U.S. 210, 225 (1990); *Estelle v. Gamble*, 429 U.S 97 (1976).

This case presents issues relating to both the negative and affirmative Eighth Amendment duties on MCF correctional officers. In the former, Plaintiff brings an excessive force claim, contending that Defendant Jenkins's use of a Taser was in violation of Plaintiff's freedom from excessive force under the Eighth Amendment. In the latter, Plaintiff brings two claims: a conditions of confinement claim, contending that Defendants Adams', Hudson's, and Jenkins' use of the word "snitch" violated Plaintiff's right to humane conditions of confinement under the Eighth Amendment, and an inadequate medical care claim, contending that medical treatment rendered by Defendant McInnis was in violation of Plaintiff's right to medical care under the Eighth Amendment.

### 1.  Excessive Force

Plaintiff alleges that Defendant Jenkins' use of a Taser to break up the altercation between Plaintiff and prisoner Gunn rises to the level of excessive physical force, violative of the Cruel and Unusual Punishments Clause. The question before this Court is whether or not a genuine issue of material fact exists so as to preclude summary judgment for either Plaintiff or Defendant on the claim of excessive force.

The settled rule that "the unnecessary and wanton infliction of pain … constitutes cruel and unusual punishment forbidden by the Eighth Amendment" governs this issue. *Ingraham v. Wright,* 430 U.S. 651, 670 (1977) (quoting *Estelle,* 429 U.S. at 103). However, the "unnecessary and wanton" standard varies "according to the nature of the alleged constitutional violation." *Whitley v. Albers*, 475 U.S. 312, 1085 (1986).  In *Hudson v. McMillian*, the Supreme Court outlined a framework for analyzing claims where "prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause." 503 U.S. at 6-7. Under this framework, the "core judicial inquiry" is "whether force was applied in a good-

faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Id* at 7.

Although "force" remains the key inquiry, the seriousness of injury may also factor into a court's excessive force analysis. In defining the legal framework, the *Hudson* court rejected a "significant injury" threshold requirement for stating an excessive force claim. However, *Wilkins v. Gaddy,* fleshed out a place for "injury seriousness" in excessive force analysis by holding that the "extent of injury may … provide some indication of the amount of force applied." 559 U.S. 34, 37 (2010). The *Wilkins* court was careful to note, however, that the absence of a certain quantum of injury cannot be dispositive on its own terms, and the "injury" analysis should not bypass the "core judicial inquiry" into force. *Id* at 39. "Injury and force … are only imperfectly correlated, and it is the latter that ultimately counts." *Id* at 38.

In his affidavit and supporting materials, Plaintiff relies on three main facts to establish a genuine dispute of material fact, or, alternatively, to entitle him to summary judgment on this issue. First, that he was struck with the Taser not once, as claimed by Defendants, but twice (and that the second shot hit his face, chipping his tooth and causing his lip to bleed, and also triggering him to "urinate and defecate upon himself.") (Ex. C Pl. Mot. Summ. J.). Second, that Defendant Jenkins ran electrical current through the Taser, periodically, during a 30 second to two minute span. Third, that MCF has a Taser policy that promotes "systematic excessive force." (Ex. K. Pl. Add.).

The totality of Plaintiff's evidence does not adequately raise a factual issue relating to the application of force used by Defendant Jenkins. The thrust of Plaintiff's factual claims are fundamentally "injury" related, and do not illuminate a factual dispute as to the "good-faith" or "malicious and sadistic" nature of the use of force. Although the amount of time Defendant ran

16

electrical current through the Taser might otherwise inch toward such a dispute, even Plaintiff is unsure whether the current was periodically deployed over a 30 second or 120 second duration. Lastly, the "MI-CURE News" article provided by Plaintiff falls woefully short of establishing evidence of a policy of "systematic excessive force" at MCF.

A proper inquiry into "force" asks how the force was *applied*; whether its application was in a "good-faith effort to restore discipline" or if it was used "maliciously and sadistically to cause harm." *Whitley*, 475 U.S. at 320-21. In the instant case, the immediate circumstances surrounding the application of Defendant's use of force are not in dispute. Plaintiff does not deny that there was a disturbance and, therefore, a need to restore discipline; Plaintiff admits that he was engaged in a physical altercation with prisoner Gunn. Moreover, Plaintiff does not deny, as asserted by Defendants, that Plaintiff was seen "deliver[ing] closed hand punches to [the] upper and lower body of Gunn." (Ex. 2 Def. Mot. Summ. J.). Nor does Plaintiff deny Defendant's claim that it was only after "[Plaintiff] did not comply with orders to stop fighting" that Defendant Jenkins struck Plaintiff with a Taser. *Id.*

The Court also notes that the use of a Taser is not a *per se* violation of a prisoner's Eighth Amendment rights. *See Caldwell v. Moore*, 968 F.2d 595, 600 (6th Cir. 1992). Defendant Jenkins' use of the Taser to break up the altercation between Plaintiff and prisoner Gunn was not "excessive," given Defendant's interest in the threat posed by the altercation to other inmates, prison workers, administrators, and visitors. *See Hudson*, 503 U.S. at 6 (discussing the factors courts consider when deliberating a prison official's use of force). Moreover, the unsubstantiated allegation that Defendant Jenkins, at unspecified times between October 2012 and February 2013, called Plaintiff a "snitch" does not create a factual basis to dispute that Jenkins' use of the Taser was "malicious and sadistic."

17

Plaintiff's allegations of fact penetrate the issue of "injury," which is not central to the Court's analysis, and do not raise material factual issues relating to the application of Defendant's use of force. Given the undisputed facts surrounding the circumstances in which force was applied, in which two prisoners were fighting and each resisted calls to stop, and the Defendant's competing interests in maintaining order, it is clear that Defendant Jenkins did not use the Taser "maliciously and sadistically to cause harm." Summary judgment for Plaintiff is DENIED, and summary judgment in favor of Defendant Jenkins is GRANTED.

### 2.  Conditions of Confinement

In his second Eighth Amendment claim, Plaintiff alleges that Defendants Adams, Hudson, and Jenkins violated his right to humane conditions of confinement by labeling him a "snitch" in front of other inmates, encouraging these inmates to commit an assault on Plaintiff. The question before the Court is whether a genuine issue of material fact exists to preclude summary judgment for any party on this matter.

Like the excessive force analysis, the "unnecessary and wanton" standard also applies to a conditions-of-confinement claim arising under the Eighth Amendment. "Wanton" applies differently, however, to a prison officer's conduct in a conditions-of-confinement claim than in an excessive force claim. Unlike the clash in interests between the State's responsibility to use minimal physical force and other important governmental responsibilities (like the safety of other inmates, officers, administrators, visitors), courts have recognized that the State's responsibility to attend a conditions-of-confinement claim does not ordinarily clash with other equally important governmental responsibilities. *Wilson v. Seiter*, 501 U.S. 294, 300-03 (1991). Addressing this asymmetry, the Supreme Court has attached a mental element to claims that assert a prison officer has acted "wantonly" in a conditions-of-confinement claim. *Id* at 300. The

mental element that must attach is "deliberate indifference." *Id.*; *see also Farmer v. Brennan*, 511 U.S. 825, 834 (1998).

Deliberate indifference is a standard that draws heavily from the conceptual construction of "subjective recklessness" in the criminal law.  Under the Supreme Court's enunciation of the standard,

> a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Id* at 837; *see also Cooper v. Cnty. of Washtenaw*, 222 Fed.Appx. 459, 466 (6th Cir.2007); *Brooks v. Celeste*, 39 F.3d 125, 128 (6th Cir.1994).

"Thus, the subjective component actually has three prongs embedded within it." *Cooper*, 222 Fed.Appx. at 466. First, Plaintiff "must show that the official subjectively perceived the facts that gave rise to the inference of the risk." *Id*. Next, Plaintiff "must show that the official actually drew the inference, and, importantly, not just that he or she should have done so." *Id* (*citing Farmer*, 511 U.S. at 839; *Brooks*, 39 F.3d at 128). Last, Plaintiff "must show that the official consciously disregarded the perceived risk." *Id*.

Whether or not the three Defendants ever called Plaintiff a "snitch" is undoubtedly in dispute.  To be successful on a motion for summary judgment, however, Defendants must only point out that Plaintff "has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex*, 477 U.S. at 323. Here, Defendants have argued that, even if he was called a "snitch," Plaintiff has not established evidence sufficient for a reasonable jury to find that Defendants had the requisite mental state vis-à-vis the risk of physical harm to Plaintiff posed by other prisoners. As to Defendants

Hudson and Jenkins, the Court agrees. Plaintiff has not established any factual evidence going to the mental state of these Defendants during the times he alleges they called him a "snitch." His dates are vague, his assertions are conclusory, and, at times, his allegations are inconsistent.

Plaintiff's affidavit does, however, make factual claims specific enough to put Defendant Adams' mental state sufficiently in dispute to preclude summary judgment. First, Plaintiff specifies a particular date upon which Adams called him a "snitch" (January 18, 2013, the day before the altercation with prisoner Gunn). Second, he claims that this label was used in the company of prisoner Gunn. Third, he alleges that Defendant Adams, during the same encounter on the same date, offered to "pay any prisoner who assaulted [Plaintiff]." (Ex. C Pl. Mot. Summ J.). Defendant Adams denies this series of allegations.

At the summary judgment stage, the Court must only determine if Plaintiff "allege[d] facts which, if true, would show that the official being sued perceived facts from which to infer substantial risk to the prisoner, that he [or she] did in fact draw the inference, and that he [or she] then disregarded that risk." *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001). This "satisfies our twin goals of keeping the standard high enough so that it does not amount to mere negligence and low enough that it is possible for a plaintiff to survive summary judgment without proving his or her entire case." *Cooper*, 222 Fed.Appx. at 467-68. The combination of facts alleged by Plaintiff, that Adams called Plaintiff a "snitch" while offering to pay Gunn for an assault on Plaintiff, produces a sufficient factual dispute as to Defendant Adams' mental state vis-à-vis prisoner Gunn's assault on Plaintiff to survive a motion for summary judgment.

On the issue of Plaintiff's Eighth Amendment conditions of confinement claim, the Court will GRANT summary judgment for Defendants Hudson and Jenkins, and DENY summary judgment for Plaintiff and Defendant Adams.

### 3. Medical Care

In his final request for relief under the Eighth Amendment, Plaintiff claims that Defendant McInnis, a nurse at MCF, violated his right to medical care when she failed to document Plaintiff's injuries, denied Plaintiff the provision of medication, and failed to transfer Plaintiff to a hospital for further treatment after the use of a Taser by Defendant Jenkins. Plaintiff claims that Defendant McInnis knew Plaintiff needed medical treatment and "aided in [the] cover up of excessive force and [denial of] medical treatment." (Pl. Mot. Summ. Judg. at 16). The question before the Court is whether or not sufficient evidence exists to preclude summary judgment for either Plaintiff or Defendant McInnis.

Plaintiff's claim is governed by *Estelle v. Gamble*, 429 U.S. 97, 104 (1976), which held that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain'" proscribed by the Eighth Amendment. (*quoting Gregg v. Georgia* 428 U.S. 153, 173 (1976)). The inquiry demands a two-pronged analysis. First, the "deliberate indifference" standard requires a subjective query into the mental state of the Defendant. This "deliberate indifference" standard is the same as outlined in the conditions of confinement claim, *supra*. Second, an objective inquiry is made into whether the deprivation was "sufficiently serious." This prong was identified in *Wilson*, 501 U.S. at 300, as deriving from *Rhodes*, 452 U.S. 337 (1981), where the Supreme Court considered whether housing two inmates in one cell constituted "cruel and unusual" punishment violative of the Eighth Amendment. The *Rhodes* decision turned on the objective component and held that,

> conditions that cannot be said to be cruel and unusual under contemporary standards are not unconstitutional. To the extent that such conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society.

*Rhodes*, 452 U.S. at 347.

Here, Plaintiff has failed to put forward evidence demonstrating a dispute of material fact as to the elements of his claim against Defendant McInnis. As to the subjective element, "a prisoner advancing such a claim must, at a minimum, allege 'deliberate indifference' to his 'serious' medical needs." *Wilson*, 501 U.S. at 297 (*quoting Estelle*, 429 U.S. at 106). "'It is only such indifference' that can violate the Eighth Amendment." *Id* (*quoting Estelle*, 429 U.S. at 105-6). Alleging an "'inadvertent failure to provide adequate medical care,' or a 'negligent ... diagnos[is],' simply fail[s] to establish the requisite culpable state of mind." *Id* (*quoting Estelle*, 429 U.S. at 105).

Under the subjective "deliberate indifference" standard, Plaintiff has not produced facts to dispute the requisite mental state of Defendant McInnis vis-à-vis Plaintiff's alleged medical needs. Plaintiff attempts to establish this element with an Electronic Control Device usage report, generated by prison officials, which summarizes the circumstances surrounding the Taser's deployment. Plaintiff contends that, because the usage report states Plaintiff was only shot once in the right hip, it "covers up" the fact that a second shot hit Plaintiff in his face, causing him facial injuries that went untreated by Defendant McInnis. Plaintiff argues that Defendant McInnis denied him medical treatment as part of a conspiracy with other prison officials to make it appear that Plaintiff was not shot in the face. By failing to render treatment or document evidence of a bloody lip and chipped tooth, Plaintiff alleges that Defendant McInnis knew of (and disregarded) an excessive risk to Plaintiff's health in order to effectuate the conspiracy. However, Plaintiff cannot establish Defendant McInnis' mental state using the absence of evidence (i.e., the lack of documentation of medical treatment) as evidence of a conspiracy. Plaintiff has failed to put the subjective element of his claim in dispute.

As to the second element, Plaintiff has also failed to demonstrate that he suffered a serious medical need. Seriousness is measured objectively, in response to "contemporary standards of decency." *Hudson*, 503 U.S. at 8 (*citing Estelle*, 429 U.S. at 103). In the Sixth Circuit, a medical need of this type has been defined as one "that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008) (citations omitted); *see also Jones v. Muskegon Cnty,*, 625 F.3d 935, 941 (6th Cir. 2010).

Plaintiff's documentation, affidavits, and other materials do not support the seriousness of his alleged injury. An objectively serious risk has been found where an inmate had colorectal cancer and died as the result of his illness (*Jones*, 625 F.3d 935 (6th Cir. 2010)), where an inmate had suicidal tendencies (*Horn by Parks v. Madison Cnty. Fiscal Ct.*, 22 F.3d 653 (6th Cir. 1994)), and where an inmate died after a severe asthma attack, showing symptoms including wheezing, difficulty breathing, and tightness in the chest (*Harrison*, 539 F.3d 510). The injuries Plaintiff claims to have sustained, a chipped tooth and bleeding lip, do not rise to the level of an objectively serious medical need "that has been diagnosed by a physician as mandating treatment" or "is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Harrison*, 539 F.3d at 518. It is significant that Plaintiff has not claimed to have sought medical or dental treatment following the Taser's deployment, nor did he complain of any lasting effects of the alleged Taser prong to the face. Plaintiff has failed to put the objective seriousness of his medical needs in dispute.

Plaintiff's motion is DENIED and Defendant's motion is GRANTED.

23

### D.  Qualified Immunity

Each Defendant contends that, even if Plaintiff has established any claim, they are shielded from civil liability by the doctrine of qualified immunity. The Court will address this issue as it relates to each of the three claims in which Defendants' motion for summary judgment has not been granted.

The doctrine of qualified immunity protects government officials insofar as they are not "plainly incompetent or … knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). More precisely, "[g]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The Sixth Circuit has established a tripartite analysis for evaluating claims of qualified immunity.

> First, we determine whether a constitutional violation occurred; second, we determine whether the right that was violated was a clearly established right of which a reasonable person would have known; finally, we determine whether the plaintiff has alleged sufficient facts, and supported the allegations by sufficient evidence, to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights.

*Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir. 1999); *Dickerson v. McClellan*, 101 F.3d 1151, 1157–58 (6th Cir. 1996).

As to the First Amendment retaliatory transfer claim against Defendants Sgambati, Grant, Plummer, and Steward, the Court finds they are not immune from civil liability. As to the first element, determining whether a constitutional violation has occurred, the Court finds that the right at issue is Plaintiff's right to file grievances without facing retaliation. Government actions, "which standing alone do not violate the Constitution, may nonetheless be constitutional torts if motivated in substantial part by a desire to punish an individual for exercise of a constitutional

24

right." *Thaddeus-X*, 175 F.3d at 386; *accord Crawford–El v. Britton,* 523 U.S. 574, 118 (2008). It is "undisputed [that an inmate has a] First Amendment right to file grievances against prison officials on his own behalf." *Herron,* 203 F.3d 415; *accord Hill,* 630 F.3d 468. This informs the second prong of the analysis, whether the right was clearly established and a reasonable person would know. The undisputed nature of the right to file grievances and the right to be free from retaliation are clear; any reasonable person would know that transferring an inmate on the basis that he exercised this right will amount to a constitutional violation.

As to the third element, whether the officials' alleged conduct was objectively unreasonable in light of the constitutional right, "it would be clear to a reasonable official that his conduct was unlawful in the situation he confronted." *Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 684 (6th Cir. 2013) (internal brackets omitted). Plaintiff has alleged that each Defendant told him they would transfer him if he kept filing complaints, and, at this time, Defendants have failed to adequately present evidence demonstrating that Plaintiff was transferred for another reason.

As to the First and Eighth Amendment claims involving Defendant Adams, each of which arise out of Adams' alleged reference to Plaintiff as a "snitch," Defendant Adams is not entitled to qualified immunity. In determining whether a constitutional right was violated, the right at issue in the First Amendment claim is the same outlined above: Plaintiff's right to file grievances without facing retaliation. The right at issue in the Eighth Amendment claim is Plaintiff's right to humane conditions of confinement. Second, the Court must determine if these rights are clearly established and a reasonable person would have known. As determined in the analysis of these claims, *supra*, both rights are clearly established by controlling authority in the Sixth Circuit or the Supreme Court, and a reasonable person would have known of their establishment.

Lastly, the Court must consider whether the Plaintiff has alleged facts sufficient to indicate that the officials conduct was objectively unreasonable in light of the established constitutional rights.  The facts alleged by Plaintiff, which this Court has found to be sufficient to survive summary judgment, contend that Adams had the purpose of inducing an attack on Plaintiff. As Plaintiff has framed his claims, at issue is whether or not Adams purposely violated Plaintiff's constitutional rights. Sufficiently alleged, Adams' actions, if purposefully calculated, would be "objectively unreasonable in light of the clearly established constitutional rights." *Williams*, 186 F.3d at 691.

## IV. CONCLUSION

For the reasons outlined above, Plaintiff's Motion for Summary Judgment  [#29] is DENIED and Defendants' Motion for Summary Judgment [#25] is GRANTED IN PART AND DENIED IN PART.  Plaintiff's Motion to Amend Complaint [#33] is DENIED WITHOUT PREJUDICE.

Defendants Hudson, Jenkins, and McInnis are dismissed from this cause of action.

SO ORDERED.


Dated: August 27, 2014


                                        /s/Gershwin A Drain
                                        GERSHWIN A. DRAIN
                                        UNITED STATES DISTRICT JUDGE